Filed 2/25/25  S.F. v. Hunter CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| S.F., | B324129 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 22SMRO00115) |
| v. | |
| JAMES WEBB HUNTER, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, David W. Swift, Judge.  Affirmed.

Lewin Law Group and Chad M. Lewin for Defendant and Appellant.

Law Office of A. George Glasco and A. George Glasco for Plaintiff and Respondent.

Plaintiff and respondent S.F. (plaintiff) applied for a Domestic Violence Prevention Act (DVPA) restraining order against defendant and appellant James Hunter (defendant). The two were formerly in a sexual relationship, which defendant at one point described as a "sugar baby" relationship (we'll explain). At the restraining order hearing, plaintiff testified, defendant exercised his right against self-incrimination when notified of plaintiff's intent to call him as a witness, and the trial court ruled a five-year restraining order should issue on two alternative bases: under the DVPA as requested and, sua sponte without objection, as a civil harassment restraining order under Code of Civil Procedure section 527.6 (Section 527.6). We are asked to decide whether the court erred in advising defendant he would not be permitted to invoke his right against self-incrimination on a question by question basis, whether the substantial evidence supports the trial court's finding the parties were previously in a "dating relationship" as defined by the DVPA,[1] and whether the trial court's alternative Section 527.6 basis for issuing the order violated defendant's due process rights. For reasons we shall explain, answering only two of these questions is necessary.

## I. BACKGROUND

On April 15, 2022, plaintiff, then 22 years old, called the police to report defendant as a stalker. Plaintiff explained to responding officers that she and defendant, who was then 44

---

[1] "'Dating relationship' means frequent, intimate associations primarily characterized by the expectation of affection or sexual involvement independent of financial considerations." (Fam. Code, § 6210.)

2

years old, had been in a sexual relationship that lasted approximately one year. She ended the relationship in 2019, and defendant reportedly refused to accept that and had been a "problem" for her ever since.

Plaintiff explained that, on multiple occasions since the termination of their relationship, defendant threatened to share sexually explicit images of her on social media if she contacted the police. According to plaintiff, defendant had appeared at her residence uninvited on multiple occasions and, on another occasion, he secretly followed her to dinner and sent her text messages describing what she ate and drank. Plaintiff explained her call to the police that day was triggered when she received multiple phone calls and text messages from defendant asking for "alone time" with her and plaintiff's mother subsequently realized defendant was parked in the alley behind their home.

While she was being questioned by the officers, defendant called and sent text messages to plaintiff warning her about contacting the police; the messages suggested defendant knew police officers were at her residence. The police advised plaintiff to obtain a restraining order.

### A. Plaintiff Obtains a Temporary Restraining Order

On April 21, 2022, plaintiff submitted a form application for a domestic violence restraining order to protect herself and her mother, father, and younger brother from defendant. On her application, plaintiff checked a box stating she and defendant "are dating or used to date." She explained that in addition to "[c]ontinued and persistent stalking, including constant harassment through text messages, calls and social media outreach," defendant "threatened to publish explicit photos of

3

[her] on the internet unless [she] agreed to meet him in private." She attested further that defendant made "multiple unwelcome attempts in person to come near [her] home, has been seen in . . . close vicinity of [her] home and neighborhood, has threatened to . . . get [her] expelled from school and to ruin [her] personal reputation through slander . . . ." Attached to her application were 10 pages of supporting documents, including a copy of the police report, copies of text messages, and letters from her and her parents to the court.

In one of the attached text message exchanges, plaintiff received the following message: "Let's make peace please [¶] I won[']t harass you[,] [I] swear [¶] I won[']t be jealous [¶] I won[']t interfere with who you are seeing." Plaintiff responded: "Do not contact me or this number, be advised I have contacted the police." The response was as follows: "Lmao [¶] Be advised that I don[']t give a fuck." In another text message attaching a sexually explicit video of plaintiff, defendant said, "You mention the police to me again and it goes on Pornhub[.]" There were also other text messages threatening dissemination of sexually explicit images of plaintiff and making lewd comments.

In the letter to the court plaintiff submitted with her restraining order application, she explained she began her relationship with defendant in 2019 and admitted it "was not a healthy relationship." After she broke it off and took steps to block any further communications from defendant, he "eventually tracked [her] down" and "threatened to send explicit pictures to the dean of my school and put sexual photos and videos of me on the internet. [¶] He also threatened me with putting videos of me on porn sites if I went to the police." After plaintiff told her parents about defendant, "he started harassing them as well. He

4

contacted my ex-boyfriend as well as threatening to send pictures to any future boy I dated."

The letter from plaintiff's father stated he was "personally present" when defendant approached the family home and demanded to see plaintiff in private. He also said he had been "on or near the phone when [defendant] has called or messaged with threatening and unrelenting acts of attempted blackmail and coercion, desperation, obsession, and utter vulgarity." The letter from plaintiff's mother related defendant impersonated her husband "in an effort to get information from others" about plaintiff and had vandalized the family home. She added that she cannot forget defendant's "hate[-]filled words" when she personally spoke with him on the telephone and she advised she is afraid to leave plaintiff alone in the house. She reported that as a result of defendant's harassment, plaintiff had "lost her appetite, hardly sleeps, and exhibits severe social anxiety."

The trial court issued a temporary restraining order forbidding defendant from contacting or approaching plaintiff and her family at home, work, or school. The court also noticed an evidentiary hearing to consider issuing a more permanent restraining order.

B.    *The Restraining Order Hearing*

The trial court held the restraining order hearing in August 2022, and both plaintiff and defendant were represented by counsel at the hearing.[2]   The court admitted plaintiff's application and supporting exhibits in evidence and she testified.

---

[2]    The hearing was originally calendared for May of that year but had been continued multiple times at defendant's request

5

On direct examination, plaintiff testified her relationship with defendant began while she was in her last year in high school and the "amicabl[e]" phase of that relationship lasted between one and a half to two years. After she ended the relationship in August 2019 (about the time she started college), however, defendant began calling her in the middle of the night and pleading with her to continue the relationship. When she refused, he threatened to share sexually intimate videos of her—which were recorded without her consent—with family, the dean of her college, and others.

Plaintiff acknowledged defendant did not directly threaten to harm her physically, but she explained he made her fearful and he threatened to harm himself ("he said if I ever blocked him or stopped him, that he would . . . kill himself . . . in front of my house"). Defendant also got other people to call plaintiff, including "multiple random women," who would deliver "really cryptic messages," such as "[Defendant] is looking for you. Be careful where you go. Be careful who you meet. He's angry. It's not over." Defendant also sent "really scary" messages to plaintiff on social media. In response, plaintiff changed her phone number, purchased and downloaded to her cellular phone an application that blocked telephone calls from numbers with no identifying information, and told "everyone [she] knew" not to give defendant her new phone number.

Discussing the specific events that triggered her call to the police and request for a restraining order, plaintiff testified she

_____

based on his belief that criminal charges might be filed against him. At the time of the hearing, no criminal charges had been filed.

felt "harassed" and "intimidated" when she received the text messages she submitted in support of her application and "terrified" when she saw defendant standing outside her home. She agreed to leave the house to speak with him because he promised over the phone to end his harassment if she told him face-to-face to leave her alone. Once she was outside, defendant apologized and told her he had left her a "birthday present" in the alley behind her home; plaintiff discovered her new social media name and the words "I see you" had been spray-painted on a mural on the back wall of her family's property. Defendant then ran towards her, causing her to back up in fear: "I can't really describe that fear. It's painful in your stomach. It's physical."

On cross-examination, defendant's attorney asked about the origins of plaintiff's relationship with defendant. She testified defendant contacted her on social media asking if she was interested in a "sugar baby" relationship.[3] That contact then led to exchanges between them on Instagram and Snapchat, and ultimately, plaintiff had sex with defendant a "handful" of times

---

[3]  "[S]ugar dating is typically understood to mean an arrangement between a 'sugar daddy' or 'sugar momma,' namely an older, wealthier individual, and a 'sugar baby,' who is a younger, financially motivated person." (*Reflex Media, Inc. v. Successfulmatch.com* (N.D.Cal. December 6, 2022, Case No. 20-cv-06393-JD) 2022 WL 17477109 at *1.)  In exchange for money or valuable gifts, the sugar baby provides companionship and/or sexual favors to the older person. (*Reflex Media, Inc. v. Luxy Ltd.* (C.D.Cal. October 3, 2021, Case No. 2:20-cv-00423-RGK-KS), 2021 WL 5936974 at *1; *Infostream, Inc. v. PayPal, Inc.* (N.D. Cal. August 28, 2012, Case No. C 12–748 SI) 2012 WL 3731517 at *1 & fn. 1.)

and each time for money, with the amount increasing from $300 the first time to $4,000 the final time. Plaintiff acknowledged she also "willingly" sent intimate still photos of herself to defendant in exchange for money. Plaintiff broke things off with defendant in 2019 because "she was feeling disgusted by the relationship" and "couldn't handle it anymore."

Between August 2019 and April 2022, plaintiff saw defendant in person only one other time before she saw him outside her house and called the police: while out walking with her boyfriend, she spotted defendant walking down the street toward her home. Between 2019 and early 2021, however, defendant and plaintiff spoke by phone "all the time. There were discussions, conversations about the same thing over and over again. You know, threats, [defendant] calling saying 'I love you. I just want you back.' Multiple conversations." After she changed her phone number in 2021 and moved away from the family home, plaintiff did not receive any phone calls or text messages from defendant until shortly before she called the police in April 2022 because he "couldn't find [her]."

Defendant's attorney also questioned plaintiff about a movie defendant was supposedly producing (entitled "Vagabond Lover 1999").[4] She recalled doing some voiceovers for the movie, but she denied receiving money to act in the film or signing a

---

[4] Plaintiff testified she believed the film was about "an older man having a relationship with a younger girl." The cross-examination of plaintiff indicates defendant filed a contract-based civil suit against plaintiff in connection with the movie project and served her with the complaint and summons the day before the restraining order hearing.

contract to appear in it.  When asked whether she and defendant discussed this movie during the less amicable "I want you back" phase of their relationship, plaintiff testified "it was never the focus of any conversation we had . . . . [¶] What he wanted from me was to see me again, to have me back in his life, and for me to never block him or to leave him.  That was the main point of any conversation we had."

When plaintiff's counsel advised that his next witness would be defendant, the trial court asked defense counsel whether his client would testify or exercise his right against self-incrimination.  Without objection, the trial court briefly explained that right as follows:  "Just so there's no confusion, sir.  We don't allow people to selectively exercise [Fifth] Amendment rights.  You have [Fifth] Amendment rights, so you do not have to testify.  I'm not going to get you on the stand and have you answer every question with 'I assert my [Fifth] Amendment rights.' [¶] . . . [I]t's perfectly fine, and I won't hold it against you.  You are allowed to do that.  [¶]  What's not okay is for you to pick and choose what questions you want to answer and what questions you are going to decline to answer.  That's not how it works.  So, you either decline to answer questions, which is your right, or you answer all of the questions."

After a pause in the proceedings to confer with counsel, defendant personally stated he "would very much like to testify," but he would follow his attorney's recommendation and decline to do so.  Defense counsel also confirmed for the court that he advised his client to invoke his right against self-incrimination and refuse to testify.

After the presentation of evidence, the court heard brief argument from counsel.  Defendant's attorney made what he

characterized as a "motion to dismiss" because there was no evidence of a dating relationship under the DVPA. Defendant's attorney emphasized plaintiff's testimony that the only meetings between defendant and plaintiff were for sex in exchange for money. Defense counsel also argued there was no basis to issue a restraining order even putting aside the dating relationship issue because there was too big a gap between when the parties' communication tapered off in 2019 and plaintiff's call to the police in 2022.

The trial court remarked that defense counsel gave it "more to think about than [it] expected with the [dating relationship] argument." The court, however, found there was sufficient evidence the parties were in such a relationship. The trial court also found in the alternative—and without objection from the defense—that it had "the authority to convert a [DVPA] application into a civil harassment restraining order application" and that the facts supported issuance of a restraining order under that statute too.[5] Specifically, the court found by clear and convincing evidence that defendant engaged in unlawful harassment, threats, and a "knowing and willful course of conduct that would reasonably place a person in fear for herself and her immediate family."

---

[5]     After the court stated it would make an alternative Section 527.6 finding, defense counsel asked to make a record and argued he believed the evidence would not permit an order to issue under that statute because there was insufficient evidence of "a series of acts and a series of incidents that happen in order for a court to grant that." Defense counsel did not contest the court's authority to conform the evidence to proof and alternatively grant the restraining order under Section 527.6, however.

10

The five-year restraining order the court issued prohibited defendant from contacting, harassing, or otherwise disturbing the protected parties' peace; in addition, the court ordered defendant not to distribute post, share, or send any sexually explicit images of plaintiff via any medium.

## II. DISCUSSION

Novel questions abound concerning the definition of "dating relationship" in Family Code section 6210: whether the "independent of financial considerations" proviso modifies the "expectation of affection" element or just the "sexual involvement" element, what precisely "financial considerations" means, and just how independent must sexual involvement (or expectation of affection) be from such considerations. But these are questions for another day; we need not answer them to resolve this appeal.

We hold defendant's challenge to the court's self-incrimination advisement fails because a civil litigant like defendant can be advised selective invocation of the right is not permitted and because defendant in any event makes no showing of prejudice from the court's advisement. We further hold the trial court did not violate defendant's due process rights by alternatively conforming plaintiff's request for a restraining order to proof and justifying the order under Section 527.6; the due process argument defendant makes now is forfeited because there was no objection below and, regardless, conforming to proof was permitted when the elements of the two statutory predicates (DVPA and Section 527.6) were related and did not adversely impact the presentation of evidence. Because there is no other

11

challenge to the Section 527.6 basis for the trial court's order, we shall affirm it.

### A. Reversal Is Not Warranted for an Asserted Misstatement of Self-Incrimination Principles

"It is well settled that the privilege against self-incrimination may be invoked not only by a criminal defendant, but also by parties or witnesses in a civil action. [Citation.] However, while the privilege of a criminal defendant is absolute, in a civil case a witness or party may be required either to waive the privilege or accept the civil consequences of silence if he or she does exercise it. [Citations.]" (*Alvarez v. Sanchez* (1984) 158 Cal.App.3d 709, 712; accord, *Oiye v. Fox* (2012) 211 Cal.App.4th 1036, 1054.) "'[I]t is not unconstitutional to force a litigant to choose between invoking the Fifth Amendment in a civil case, thus risking a loss there, or answering the questions in the civil context, thus risking subsequent criminal prosecution. [Citations.]'" (*Avant! Corp. v. Superior Court* (2000) 79 Cal.App.4th 876, 886; accord, *In re Marriage of Sachs* (2002) 95 Cal.App.4th 1144, 1155 ["'[A] civil defendant does not have the absolute right to invoke the privilege against self-incrimination. . . . A party or witness in a civil proceeding "may be required either to waive the privilege or accept the civil consequences of silence if he or she does exercise it"'"].)

As the United States Supreme Court has explained, "a witness has the choice, after weighing the advantage of the privilege against self-incrimination against the advantage of putting forward his version of the facts and his reliability as a witness, not to testify at all. He cannot reasonably claim that the Fifth Amendment gives him not only this choice but, if he elects

12

to testify, an immunity from cross-examination on the matters he has himself put in dispute.  It would make of the Fifth Amendment not only a humane safeguard against judicially coerced self-disclosure but a positive invitation to mutilate the truth a party offers to tell. . . . The interests of the other party and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination." (*Brown v. United States* (1958) 356 U.S. 148, 155-56.)

In advising defendant that he could either testify and answer all questions put to him or invoke his right to remain silent, the trial court did not err.  The court's position was consistent with the high court's view of the matter in *Brown*.  The cases defendant cites as ostensible support for his contention that the court should have instead allowed him to assert his right against self-incrimination on a question-by-question basis all involve factual scenarios that are distinguished from the posture of this case.  (*A & M Records, Inc. v. Heilman* (1977) 75 Cal.App.3d 554, 564-565, 566 [affirming order precluding defendant from testifying at trial on matters he refused to testify about at his deposition based on his Fifth Amendment privilege against self-incrimination]; *Warford v. Medeiros* (1984) 160 Cal. App.3d 1035, 1038-1039, 1045-46 [trial court erred by not conducting a particularized inquiry into nonparty deponents' refusal to answer questions at their deposition based on their Fifth Amendment rights]; *Fuller v. Superior Court* (2001) 87 Cal.App.4th 299, 308 [any discovery order with respect to security guards' privilege against self-incrimination would be premature until depositions commenced and the guards invoked

13

that privilege with respect to specific questions]; *Blackburn v. Superior Court* (1993) 21 Cal.App.4th 414, 420 [addressing various issues arising out of accused child molester's refusal to answer most questions at his deposition based on his Fifth Amendment rights]; *People ex rel. City of Dana Point v. Holistic Health* (2013) 213 Cal.App.4th 1016, 1031 [trial court abused its discretion by excluding evidence on summary judgment due to a marijuana dispensary operator's invocation of the Fifth Amendment privilege during a deposition].)

Moreover, even if it was error to advise defendant he could not selectively invoke his right against self-incrimination, and even if defendant's decision not to testify can be attributed to the court's advisement rather than his attorney's independent advice, defendant did not make the required showing below that would permit us to conclude the court's advisement was prejudicial. If defendant believed there was some testimony he could have given that would have been favorable to him in this matter while not implicating his right to refrain from making statements that could be used against him in criminal proceedings, he had an obligation to make an offer of proof to describe what that testimony would have been—which would allow this court to determine whether the effective exclusion of that testimony resulted in a miscarriage of justice. (Cal. Const., art VI, section 13; see also Evid. Code, § 354.) No such offer of proof was made in the trial court, nor has defendant even now explained what that purported testimony could have been. Reversal on this ground is therefore unavailable.

14

*B.* *Defendant's Due Process Argument is Forfeited and Meritless*

In this court, defendant does not reprise the Section 527.6 argument he made in the trial court, namely, that the evidence was insufficient to meet the elements that must be proven to issue a Section 527.6 restraining order. (See generally Code Civ. Proc., § 527.6, subd. (b)(3) ["harassment" justifying issuance of a restraining order includes "unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose. The course of conduct must be that which would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress"]; *Schild v. Rubin* (1991) 232 Cal.App.3d 755, 762.) Instead, he makes a solitary, new argument: that his due process rights were assertedly infringed "because [plaintiff] never requested and the [c]ourt similarly did not indicate before taking evidence that it would contemplate issuing an order restraining different conduct and based upon different concerns from the [DVPA]." That argument, however, was waived when counsel failed to object below or ask to reopen the presentation of evidence (instead opting to contest the court's alternative ruling only based on the sufficiency of the evidence presented).[6] (See, e.g., *D.Z. v. L.B.* (2022) 79 Cal.App.5th 625,

---

[6] In the case on which defendant chiefly relies to argue his due process rights were violated, *North Coast Village Condominium Assn. v. Phillips* (2023) 94 Cal.App.5th 866, the aggrieved party did object to the court's announced course of action. (*Id.* at 878.)

15

632 ["California courts recognize that claims alleging violations of due process rights can be forfeited by failing to raise them in the trial court"]; *Hepner v. Franchise Tax Bd.* (1997) 52 Cal.App.4th 1475, 1486 ["In civil cases, constitutional questions not raised in the trial court are considered waived"].)  The trial court's restraining order therefore stands because there is no properly preserved challenge to the Section 527.6 justification for it.

Even putting aside the forfeiture for the sake of argument, defendant's due process argument still fails.  Established authority permits a trial court to amend a pleading to conform to proof "at any time before or after commencement of trial, in the furtherance of justice" (Code Civ. Proc., § 576), and decisions to permit such amendments are reviewed for abuse of discretion (*Trafton v. Youngblood* (1968) 69 Cal.2d 17, 31).  "'[N]o abuse of discretion is shown *unless by permitting the amendment new and substantially different issues are introduced in the case or the rights of the adverse party prejudiced.*'" (*Ibid.*)

There is no such showing on this record.  The trial court's reliance on Section 527.6 did not introduce new and substantially different issues; the necessary factual predicates for issuing a restraining order under Section 527.6 and under the DVPA are quite similar.  At most, the trial court's decision to conform the restraining order application to Section 527.6 proof *removed* an issue from the case (whether the parties were in a dating relationship) rather than injected a new issue that the parties could not have anticipated a need to address through the presentation of evidence.  In addition, defendant's rights were not otherwise prejudiced by the court's decision to make an alternative Section 527.6 finding.  Generally speaking, Section 527.6 in many respects is the more defendant-favorable statute:

16

it imposes a higher burden of proof (clear and convincing evidence) and requires a factual predicate that is just as stringent as the DVPA, if not more so. To be sure, Section 527.6 does not require the existence of a dating relationship, and the absence of that element did close off one avenue of the defense strategy for prevailing in this case. But the prejudice to which *Trafton* refers is not merely a lower chance of prevailing; that would necessarily exist any time there is an amendment to conform to proof. Rather, the prejudice must be some other hindrance in the presentation of evidence. (See, e.g., *McMillin v. Eare* (2021) 70 Cal.App.5th 893, 913 [""Due process requires that all parties be notified of the facts and issues in dispute, that each party be afforded a fair opportunity to present evidence in open court, and that judgment be rendered based on an evaluation of the evidence on each side, findings of fact and conclusions of law"""]; *Mac v. Minassian* (2022) 76 Cal.App.5th 510, 519 ["California courts have denied leave to amend where the proposed amendment to the complaint is during or after trial, and the amendment would require the defendant to have litigated or acted differently to assert his rights before and at trial"].) There was no such hindrance here.

DISPOSITION

The trial court's order is affirmed.  Plaintiff is awarded costs on appeal.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.

We concur:



HOFFSTADT, P. J.



MOOR, J.